Taking up our next matter, which is Stevens v. Rite Aid. Nice job. Thank you. Take care. Why don't we take a second just to let some of those folks leave the courtroom. Thank you. Okay, ready to go? Good morning, Your Honor. Allison Ho for Rite Aid. May it please the court, the judgment in this disability discrimination suit cannot stand for three primary reasons. First, Rite Aid is entitled to judgment as a matter of law on all claims, because the district court's conclusion that there was nothing feasible that Rite Aid could have done to accommodate Mr. Stevens' needle fear compels the conclusion that his wrongful termination and retaliation claims must fail too. Doesn't it also go the other direction? In other words, if the district court's conclusions about whether the jury could find that Mr. Stevens was qualified is inconsistent with the finding that he couldn't be accommodated, one of those is wrong. But it doesn't tell us that we have to accept what the judge said about one side and reject the other. It could go the other way. Respectfully, Your Honor, and I think the key to Your Honor's question, I think, frankly, it's a point of confusion in the law itself. I think that goes to the essential function argument. And so our point is that regardless, and the district court did not find, the district court rejected our position that immunizing was an essential function. If that's so, excuse me, if that's so, if it's not an essential function, then isn't the judge wrong to say there's no possibility of accommodating because there could have been an accommodation by not making him do a task that is not an essential function of the job? No, Your Honor, because even if a task isn't essential, and in our briefing we can test that. I understand. For the purposes of your question, I'll take that as a given. Even if it isn't essential, an accommodation still has to be feasible. It still has to be feasible. And I think that's a disconnect here, is that Mr. Stevens, the counsel for Mr. Stevens, seems to believe that as long as it was shown that immunizing was not essential, that Rite Aid was simply required to eliminate it with nothing further. And that, respectfully, that isn't the law. It also has to be feasible, and it's Mr. Stevens' burden to show that it's feasible. So what the district court did, after sitting through the trial and all of the evidence and hearing all the testimony, went through each option presented and talked about why Mr. Stevens had not carried his burden of showing it was feasible. Now, on appeal before this court, Mr. Stevens only focuses on one of those options, and that was the option of putting him in a dual pharmacist situation. The problem there, as the district court pointed out, was that Mr. Stevens did not show that any such position was even available. So that fails. In other words, it's not feasible because Mr. Stevens didn't carry his burden of showing that there was even a position that was. If Rite Aid doesn't engage in dialogue, I mean, wouldn't part of the dialogue be at least asking? Maybe somebody who's in one of these two pharmacist stores actually lives closer to the one where Mr. Stevens works, and they could switch, and everyone would be happy. But no one explored any of those possibilities. No one looked into whether he could be accommodated by being moved to another store. It was just, sorry, you have to perform injections or you lose your job. Several points, and there's a lot in your question. And let me start with the interactive process part of your question. Most fundamentally, it was Mr. Stevens' burden at trial to prove that regardless of what happened during the interactive process, that there was a feasible accommodation, there was a position available, and he simply didn't carry that burden. Second, because he didn't carry his burden of showing there was another feasible, there was a feasible accommodation, this court has held in McBride and other cases that even a complete failure in the interactive process, which I'll get to in a moment, we don't believe, even a complete failure, the law doesn't require the doing of a futile act. And so if there's no reasonable, no feasible or reasonable accommodation possible, the law doesn't allow liability to attach, even on the basis of a complete failure of the interactive process. Was there evidence in the record, or am I mistaken about this, that at some of the other stores there were times when there wasn't coverage and this was sort of for injections and this was worked out by saying people could make an appointment to come at another time? What your Honor is referring to is a document that was targeted at when the program was first rolled out and the pharmacists were still undergoing training, and so it could be, there were appointments made in the initial stages. But in terms of the job and the position, there was also evidence that there were times, even in dual pharmacist stores, where a pharmacist would have to work alone. So I would say there are sort of two bases for the District Court's decision that the dual pharmacist option wasn't feasible. Number one, he didn't show that there was another such position available. And number two, there was evidence that even in those stores, there would be times when a pharmacist would… Well, but if it was feasible when it was for the convenience of Rite Aid to have a system where in a certain store or for a particular period of time, customers would have to make appointments, why wouldn't it be feasible to do the same thing in this store when it's for the convenience of someone with a disability, assuming that a disability is found? Well, again, Your Honor, that was, and I take your point in terms of it was at the beginning of stages. I think in terms of now in Rite Aid's job requirement, was that all pharmacists be more for the convenience of the customers so that when someone comes in off the street… Right, but when it's for the convenience of Rite Aid because they hadn't trained everybody or whatever or because not every store has a 24-hour injector, then they make a decision that somebody may have to make an appointment outside of those hours, right? So why doesn't that show that it's feasible to do? It's just that Rite Aid chooses to do it when it's good for Rite Aid to have some inconvenience for the customers, but they won't do it to accommodate Mr. Stevens. Well, again, I would simply reiterate that this was at the beginning of the program when we were in the process of having all of our pharmacists be… Okay, and I understand the answer. I've taken up too much of your time. You have two more things you wanted to say about why you… I also wanted to ask you, can I go back to essential functions for a second? Yes, Your Honor. So I think it was litigated whether this was an essential function, and one of the documents that came in was a job description for pharmacy manager, lists 16 things that person is supposed to do, and injections is not listed there. Why wouldn't they be listed on that? That was in 2011 is my recollection, too. Yes, Your Honor, and there were actually two, one for pharmacy manager and one for pharmacist. Because I'm curious, is this just for pharmacy managers or pharmacists? I know there's, like, text that they were talking about with him. So what's the difference, and does this job description apply? Yes, Your Honor. There were actually two job descriptions in evidence. One was for pharmacy manager. One was for pharmacist. For purposes of the essential function inquiry, both were identical. Both did require that the, whether pharmacist manager or pharmacist. Was it a document? I know there was testimony by a right-hand person that pharmacists had as an essential function injections, but was there a document as well? Yes, Your Honor. There were documents. There were the actual documents of the job description for pharmacist manager and for pharmacist. Both job descriptions list certification as a job requirement. To be a certified immunizer was a job requirement. It was an essential job requirement to be certified to give injections. There was an additional requirement on the first page of those documents that talked about developing business by appropriate clinical immunizations. Your Honor is right. The document does not say exactly immunization at that point. It does, however, require an immunization certificate so that whether you are a pharmacist. It says immunization certificate? Yes, Your Honor. It does. It does require that. If you'll give me a moment, I will. Yes, Your Honor. That is on the second page. Immunization certification in the manager position. You say that. And in the pharmacist position, both pharmacist manager and pharmacist. And Mr. Stevens did not have a certification. It wasn't just that he went through the training and then wouldn't perform injections. He wouldn't go through the training. No, Your Honor. That's correct. And he initially sought to have his doctor, in fact, give him a note. But of course, the question is what a jury could decide, right? So this is one piece of evidence that favors you. But didn't one of your own people testify in effect twice, even after being asked to clarify, was asked to give a list of the essential functions and didn't include anything about injections? Your Honor, I'm glad that you gave me the opportunity to clarify that. You're talking about this is on JA367. This is the testimony of Mr. Spinks. The testimony, the question that Mr. Spinks was asked was about the job in 2010, before immunization became, in our view, an essential function of the job. And this, again, this is on JA367. He was asked, and I'll read just a portion if that would be helpful. That was answered in 2010, about a year before the immunization program. Answer, yes. Question, what was Mr. Stevens' position at that time? In other words, at 2010. And at what store? So the testimony that they point to. And then the next question is what were the duties and responsibilities? Yes, and the question was for the 2010 job. It was before that was rolled out. I see that I'm well to go. You have reserved some time, though. We'll see it in a couple minutes. Thank you, Your Honor. Ms. Callahan? Yes. Good morning, Your Honors. Thank you. Good morning. First of all, I think I'd like to address this so-called confusion in the law. It's Rite Aid's position that once the district court dismissed the failure to accommodate claim, that that wiped out all the claims. And that's not the case. And I think one of the cruxes of this case is, was this an essential job function? And the district court charged the factors that are set forth in the CFR to the jury in determining whether or not this was an essential function. There was one factor, we believe, that was in favor of Rite Aid at trial, and that was that Rite Aid took the position that once we decided in 2011 that we were going to put this immunization program into effect, giving injections became an essential job function. But if you go down the list of the rest of the factors that are listed in the CFR and that were charged to the jury, all of those are in favor of Mr. Stevens, including the fact that in that description of pharmacy manager, which is the position that Mr. Stevens held in 2011, it's not listed in the essential duties and responsibilities. It's on another page. It's listed as something that they should have, but it's not listed in the 16 essential duties and responsibilities. Why would you require an immunization certification if there weren't going to be some immunizations that he was supervising and performing? Because I think that there is some, if you couple this with their own immunization program, they came up with a written document at the same time describing the program. And in that description, and that is Exhibit P3 on page 31, clearly it indicates that not all pharmacists or pharmacy managers are going to be giving injections because it specifically provides for the appointments to be made, and customers have to make an appointment where there is not an injector available at all times. There was an allusion at trial, well, this was only meant to be. Why do they have to do it? It may be that if somebody comes in at 4 o'clock one afternoon, and let's say there's no pharmacist, they're both sick that day, the cashier says, make an appointment for tomorrow morning. And they handle it. But the fact that they can make an appointment when no one's available doesn't mean the store has to deal with somebody who can't give an immunization. They have to deal to the extent that, as Counsel for Right Aid said, if there is a feasible accommodation available. But you're saying the fact that they could schedule an appointment because nobody was available is the same as scheduling an appointment when somebody is there who happens to be unable to give an immunization. You're saying those are the same? I'm saying that they anticipate in their description of their immunization program situations where there is not always going to be someone in the store who can give an injection. But they want to be able to serve their customers as well as possible. So they say, as long as we've got people on duty who are pharmacists, we want them to give immunizations. Why isn't that a perfectly good business qualification? I think it is, but I think it also provides, because they have that in their policy manual, I think it's difficult to reach the conclusion that it could not also serve as a feasible accommodation. But wait, isn't there a substantial difference between we recognize that sometimes there will be a situation where there's no one on hand to do immunizations and we can cope with that when that happens by fortuity, and we have to accommodate in a way that will guarantee that at some particular store no one will ever be able to walk in and get an injection. They'll always have to make an appointment. And then we'll have to bring somebody from somewhere else to accommodate that appointment. And if that's the case, Your Honor, I mean, there certainly was no argument at trial to that effect, but certainly there was testimony that there were seven or eight Rite Aid stores in this immediate vicinity. And they do switch people from store to store. They cover each other. They make people available. And certainly, going along with that argument, there's no indication that they could have not sent a substitute over if that were the case and if it became essential that they had to have an immunizer available at a particular time. Also, going back to what you showed, that you're showing a feasibility was there's somebody from another store the moment a customer said, I need an injection? There was no proof on any of it. That's right. And it's your burden to show feasibility. Well, this all came in in terms of whether or not there was an essential function. It's our position that there isn't confusion between these two claims. We had a claim in here under the ADA and the New York State Human Rights Law for wrongful termination. And another position we have is that at trial, there was sufficient proof that this was not an essential function going back to the factors. Another factor to be considered that the judge charged the jury is the amount of time that was spent performing this function goes into how essential it is. Mr. Stevens testified that he himself personally, as an individual, would write 8 to 900 prescriptions, would fill those prescriptions every week. In the entire year 2011, in the three stores that were in the immediate Utica area, total combined, there were 192 immunizations given. Another factor is what's the financial- When did the program start? Was it in 2011? 2011, April. Was there any evidence about the next couple of years, how much this increased once people knew they could get flu shots at Rite Aid and CVS and other places? No, because what we were looking at is whether or not it was an essential function at the time he was terminated. Another factor to be considered is the financial impact on Rite Aid of not requiring him to perform this. No proof was offered on that. So it's our position that if you consider these factors, there was ample proof on which the jury could have determined that this was not an essential function. If it's not an essential function of his job at the time he's terminated in 2011 to give injections, then he was not required to prove a reasonable accommodation in order to make out his wrongful termination claim. No accommodation was required because he didn't have to perform that function in order to be otherwise qualified. So we also had a retaliation claim, and the basis of the retaliation claim is that he engaged in a protective activity, and that is as soon as this immunization program was announced, he wrote a letter to Rite Aid, and he referred to the ADA, and he said, I'm requesting a reasonable accommodation. In response to that, Rite Aid sent him a letter saying, we need a note from your doctor. Here's some questions. He responded to the questions. He heard nothing from them until August when they came in and met with him at the store, told him that they did not consider trypanophobia to be a disability under the ADA, that they did not think that they had a duty to make a reasonable accommodation, and that if he didn't start giving the injections, he was going to be terminated, and two days later they sent a letter confirming, and he was terminated. Then what is it about that that makes this seem like retaliation rather than a dispute about whether this was or was not an essential function or whether this was or was not a genuine disability? Again, it goes back to their response to his request, which was for a reasonable accommodation. Yes, and they said, we need to know more information. He provided the information, and they came back and said, well, we've considered this, and we disagree with you. We don't think this is a disability. Now, that may be wrong, but what is the evidence that that is retaliation? Wasn't the summation itself by the plaintiff saying the real reason he's fired is because of his disability, not as retaliation? Well, one of the reasons he was fired, we maintain, and that the proof supported at trial, is that they wanted to make an example of him. Tracy Birch, who was the Vice President of Labor Relations and General Counsel for Rite Aid, testified. The decision regarding Mr. Stevens was made before Mr. Stevens. They had already decided that once they initiated this, every pharmacist was going to have to do it. All the more reason. They're making an example of him not to say people don't raise disability claims. They're making an example of him that we take the position that this is an essential function, and everybody has to do it. Now, that may be illegal for all I know, but it's not retaliation. It's not saying we don't want any complainers. It's saying this is our position, and we're going to stick to that position. And that position was tried, and we believe that at trial that was shown to be an inappropriate position. Also, they have an obligation under the ADA, which was alluded to earlier, to engage in an interactive process. That was not done at all. Tracy Birch, again, testified that the person who was assigned, designated by Rite Aid, to interact was Mr. Farley. And he testified that he had no direct contact whatsoever with Mr. Stevens, other than to send the list of questions and then to be present at the time that he was terminated. So they also failed to engage in that interactive process that they were required to do. So it's our position that if you consider each of these claims separately, there's the wrongful termination claim, and you take a look at the elements of that, we believe that they were demonstrated adequately at trial. There's the retaliation claim, and then we also believe that the failure to accommodate claim was proven. And am I right that you only need one of those? We only need one. In fact, you only need one of six because you have both New York and federal claims, and on some of the issues there might be a difference between the New York and federal law. That's correct. And the New York State burden with respect to demonstrating a disability is even less than it is under the ADA, and we believe that we establish a disability under the ADA because Dr. Dottilio, the board-certified psychiatrist, testified not only that trypanophobia is a legitimate disability and it's recognized as a DMS-5 impairment, but he also testified to three major life activities that are delineating the CFR, lack of concentration, effect on brain function, and neurological impact of the trypanophobia. So clearly he had a disability, and Rite Aid was wrong about that. Thank you. Thank you. Ms. Hill, you've had a couple of minutes. Can I ask you before you get started on your rebuttal, and that is what about the New York state law claim? How do you prevail on that since the standards that we've been talking about this morning seem to be different? Yes. I think, in a sense, it's a non-issue because this court can, I think, the only point on which there's relevant difference is with regard to the definition of what comprises a disability. I think for purposes of us prevailing, although we dispute that it's a disability, your honors could assume that it is a disability under both federal and state law for purposes of deciding this case, and our position is that we would and should still prevail. Why? Because it's not an essential function or it's a disability under New York law? Even if it's a disability, our overarching position is regardless of whether it's an essential function or not, every claim, each of the six claims, requires Mr. Stevens to carry his burden of proof of showing there was a feasible accommodation, regardless of whether it was essential or not with respect to everyone. Isn't there a difference between wrongful termination and failure to accommodate such that if this is not an essential function of the job and someone who is otherwise qualified but has a disability and can perform all the essential functions of the job, you can't fire him? You don't have to worry about accommodation. He can do all the essential functions of the job without any accommodation. Respectfully, no, your honor, because he still has to show proof. What he's alleging is a failure to accommodate. That's a failure to accommodate claim. But if he's alleging that he was fired because he had a disability even though he could perform all the essential functions of the job, it's like saying, well, there's a blind man and he can't do everything that a sighted person can do in this job, some of which are things that people regularly do in this job, but he can do all the essential functions. I took it you can't fire him just because he can't do something tangential that a sighted person could do. I see that my time is up. May I? Go right ahead. I think the most straightforward way to respond, your honor, is that our position is that in this particular case, certainly in other cases, you might have let's say you had a case where the disabled person said, well, I was fired because they said I misused the company credit card. But an abled person did the same thing and wasn't fired. That would be a case where there would be something else. There still has to be other evidence to satisfy the because of prong. Our primary contention is that Mr. Stevens tried this case on both failure to accommodate, this is not a case, in this case it does both, and there's no evidence of any other. You still have to show discrimination, and there's no evidence in this case other than the failure to accommodate of any discrimination. No, but what if, again, to go back to the case of the blind and the sighted employees, if the reason given for firing the blind employee is that he cannot perform certain tasks that we like people to do, and he says, well, maybe you like them to do that, but it's not an essential function of the job, and so I'm qualified, and you're firing me because I can't do trivial things. Now, couldn't a jury infer from that that the reason they fired him was they just don't want people around who make life a little inconvenient? Your Honor, not if the worker there couldn't offer a feasible accommodation that would let him do it, such as a reader. I think that's a great example. This isn't a case where someone's saying if there were a reader. But that's what you need. You need the reader to do an essential function of the job if reading is something that's essential. But if there's something that, by definition or by finding of the jury, is not essential and the thing he cannot do with or without an accommodation is not essential, the test is is he qualified because he can, with or without an accommodation, perform the essential functions of the job. I take it Mr. Stevens is arguing I can perform the essential functions of the job without any accommodation. It's only something that is inessential that I can't do. And if I'm fired because I can't do something that really doesn't matter to anyone, then the jury can infer discrimination. Respectfully, no, not under this Court's cases. And the reason that it can't is because even if, and I think the point of the essential dividing line is you cannot eliminate it if it's essential. That's just, there's no argument there. Even if it's not essential, you have to show that eliminating it, which is what we're talking about here, that eliminating it, even if it's marginal, is still feasible. So, for example, let's say a situation, I'm sorry, I see my time is up. Go right ahead, it's your question. Let's say you have a situation where a fireman says, I can't drive a fire truck. And the evidence shows that, given all the other tasks, that driving a fire truck, and says someone else, someone else can drive the fire truck. That's not enough. Even if driving the fire truck is marginal, it's not enough for the fireman to say, you fired me because I won't drive the fire truck. It's not essential. Therefore, I've been discriminated against because of my disability. The fireman would still have to show that asking another person to drive the fire truck would be feasible. And if he doesn't carry his burden of showing feasible, then they're, barring any other evidence, there's still no evidence in that case that he's been terminated because of his disability. Thank you, Ms. Hogan. Thank you. We'll move to a decision on this case, and we'll turn to a vote.